# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

SHARON R.,

                                         Plaintiff,

            v.                                              3:20-CV-902
                                                            (ATB)

KILOLO KIJAKAZI,

                                         Defendant.

PETER A. GORTON, ESQ., for Plaintiff
NATASHA OELTJEN, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER
United States Magistrate Judge

## MEMORANDUM-DECISION AND ORDER

This matter was referred to me, for all proceedings and entry of a final judgment,

pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in

accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y.

Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 7).

## I.    PROCEDURAL HISTORY

On March 22, 2018, plaintiff filed an application for Supplemental Security

Income ("SSI"), alleging that she became disabled on October 1, 1999.[1] (Administrative

Transcript ("T") 73, 75, 165-70).  Her application was denied initially on June 14,

2018. (T. 73, 87-91).  Plaintiff requested a hearing, which was held by video conference

on October 9, 2019 before Administrative Law Judge ("ALJ") Melissa Hammock. (T.

---

[1] As noted by defendant, regardless of the alleged onset date, the earliest an applicant for SSI
may begin receiving benefits is the month after filing the application. *See* 20 C.F.R. § 416.335.  Thus,
the ALJ considered plaintiff's claim only as of the application date. (Def.'s Br. at 1 n.1) (citing T. 17,
26).

30-56).  Plaintiff and Vocational Expert ("VE") Kathleen Doehla testified at the

hearing. (*Id.*)  ALJ Hammock issued an unfavorable decision on October 24, 2019,

which became the Commissioner's final decision when the Appeals Council denied

plaintiff's request for review on June 15, 2020. (T. 1-5, 15-26).

## II.    GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI

disability benefits must establish that she is "unable to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In

addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such  severity
> that [she] is not only unable to do [her] previous work but cannot,
> considering [her] age, education, and work experience, engage in any other
> kind of substantial gainful work which exists in the national economy,
> regardless of whether such work exists in the immediate area in which
> [she] lives, or whether a specific job vacancy exists for [her], or whether
> [she] would be hired if [she] applied for work

42 U.S.C. § 1382(a)(3)(B).  The Commissioner uses a five-step process, set forth in 20

C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI

disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity. If [she] is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits [her] physical or mental ability to do basic work
> activities. If the claimant suffers such an impairment, the third inquiry is

2

whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience … Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from

3

both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III.   **FACTS**

Plaintiff was born on June 2, 1970,[2] making her 49 years old at the time of the ALJ's hearing. Plaintiff testified that she lived alone in an apartment. (T. 35).  Her brother lived in a separate apartment in the same home which they inherited from their parents. (*Id.*)  Plaintiff graduated from high school, but had no vocational training. (T. 36).  Plaintiff testified that after she graduated from high school, she became a "care giver" for her grandparents until they passed away. (T. 36).  After their deaths, she worked "on and off" until her mother became ill. (T. 36-37).  When plaintiff's mother

---

[2] (T. 254).

became ill, plaintiff lived with her and took care of her for many years until her death. (T. 37).

Plaintiff testified that she did not look for a job after her mother's death[3] because she was "unemployable," due to insomnia, depression, and attention deficit disorder. (T. 37). Plaintiff stated that she suffered from insomnia since 2008. (T. 38). She was "lucky" if she slept four hours per night, but her medical providers would not prescribe sleeping pills. (T. 37). However, she was taking medication for anxiety, depression, panic attacks, and mood swings. (T. 39). Plaintiff stated that she did not "nap" during the day, notwithstanding the lack of sleep at night. (T. 39). She stated that her attention span was "not good." (T. 37).

Plaintiff testified that she believed she was unable to work because her insomnia caused her to feel "drunk" during the day, so that she would be unable to concentrate on any task that her employer asked her to perform. (T. 40). She stated that she often had "migraines"[4] because of the insomnia. (*Id.*) Plaintiff testified that she had been depressed all of her life, but that she went "over the edge" when her mother died. (T. 41). With respect to her anxiety, plaintiff stated that she was not good around people, she had a difficult time being around a group of people, and when she was depressed, she got angry. (T. 41-42). Plaintiff stated that her mood swings took her from "very mellow" to "very off the handle," which could cause her to argue with an employer if

---

[3] Plaintiff testified that her mother passed away two years prior to the hearing. (T. 37).

[4] Later, plaintiff testified that she got headaches about four times per week, mostly in the morning when she got up. (T. 51). Sometimes they were "just headaches," but sometimes they were "pretty good migraines." (*Id.*) However, plaintiff took only Ibuprofen for these headaches, and she stated they were "just headaches," with no sensitivity to sound or light. (*Id.*)

she were told to perform a task. (T. 42-43).

Plaintiff also testified to suffering from panic attacks, during which her heart would "flutter[]" and then pound because she was "not good with people." (T. 43). Sometimes her hands shook. (*Id.*)  She stated that she was "kind of a hermit." (*Id.*)  She had a driver's license, was able to drive, and was able to go out by herself. (T. 44). Plaintiff testified that, although she was calm at the hearing, her panic attacks could come at any time: "pretty frequently especially the rage inside me." (T. 44).  Plaintiff stated that sometimes she could control herself, but sometimes she could not, and she would scream and swear. (T. 44-45).  Sometimes she would throw things, but she tried not to because she did not "like the idea of breaking things . . . in [her] home."[5] (T. 45).

Plaintiff described her average day, after sleeping for only four hours. (T. 49). She got out of bed and mowed the lawn, taking breaks as needed because of her back and knees. (T. 48).  She stated that she did this because "[she was] the only one who [could] do these things." (*Id.*)  Plaintiff stated that she tried to take naps during the day, but could not sleep. (T. 49-50).  The medication that she took during the day made her "slightly tired," adding to her difficulty concentrating. (T. 50).

The ALJ took testimony from VE Kathleen Doehla. (T. 52-55).  The ALJ asked the VE to consider an individual of the plaintiff's age and educational background, with no past relevant work. (T. 54).  The ALJ further asked the VE to assume that the

---

[5] Plaintiff also testified about her physical impairments. (T. 45-48).  However, plaintiff is challenging only the ALJ's determination of plaintiff's mental RFC in this action.  Thus, the court will focus on the facts relevant to her mental impairments.

individual could do light work,[6] that she could frequently climb stairs, stoop, kneel, crouch, and crawl, but that she could never climb ladders, ropes or scaffolds, or have exposure to hazards. (T. 54). The individual could perform simple, routine tasks, but not at a production rate and pace. She could have no more than occasional changes in work routine, and she could have frequent interaction with supervisors and co-workers, but only occasional interaction with the public. (*Id.*)

VE Doehla stated that such an individual could perform the following light work jobs: office helper, mail clerk, and cleaner polisher. (*Id.*) The VE also testified that, based on her experience,[7] "ten percent or more off task would preclude work." (T. 54). In response to a question posed by plaintiff's counsel, the VE stated that an employer would tolerate only one unexcused absence per month, but that this could only happen seven times per year. (T. 55).

There is a substantial amount of medical evidence in the administrative record. Rather than reciting the evidence at the outset, I will discuss the relevant materials in my analysis of plaintiff's claims.[8]

---

[6] The court notes that the hypothetical question assumed greater physical restrictions than the ultimate RFC, which assumed an individual who could perform a "full range of work at all exertional levels" with additional restrictions. (T. 21). At step 5, the ALJ found that plaintiff could perform the three **light** work jobs proposed by the VE, even though the ALJ found that plaintiff could work at all exertional levels. (T. 26). As stated above, plaintiff does not take issue with the ALJ's findings relative to her physical condition.

[7] The VE testified that the "off task" numbers were not in the Dictionary of Occupational Titles ("DOT"), so she was testifying based on her own experience with employers. (T. 54).

[8] The parties have also summarized the medical evidence in their briefs. (Dkt. No. 11 at 1-5 and Dkt. No. 14 at 2-7).

## IV.    **THE ALJ'S DECISION**

At step one of the sequential evaluation, the ALJ found that plaintiff was not

engaging in substantial gainful activity and had not done so since at least the date of her

March 22, 2018 application for SSI benefits. (T. 17).  At step two, the ALJ found that

plaintiff had the following severe impairments: major depressive disorder, an

unspecified anxiety disorder, and a sleep disorder. (*Id.*)  The ALJ found that plaintiff

had no "medically discernable" back or knee impairment. (*Id.*)  While the ALJ found

that plaintiff had a "sleep disorder," she also found, based on the evidence that

plaintiff's "obstructive sleep apnea and bipolar disorder are . . . non-medically

determinable in the relevant evidence." (*Id.*)

At step three of the sequential evaluation, the ALJ found that the severity of

plaintiff's impairments did not meet or equal the severity of a listed impairment. (T. 18-

21).  In making this determination, the ALJ considered Listings 12.04 (Depressive,

Bipolar, and Related Disorders) and 12.06 (Anxiety and Obsessive Compulsive

Disorders). (T. 18).  At step four, the ALJ found that plaintiff had the RFC to perform

work at all exertional levels with the additional limitations noted above. (T. 21-25).  In

making this determination, and as discussed in more detail below, the ALJ reviewed

plaintiff's alleged symptoms in conjunction with the medical evidence, the specific

opinions of plaintiff's providers, and the consultative opinions. (*Id.*)

The ALJ then determined that given plaintiff's specific RFC, the absence of past

relevant work experience, and the testimony of the VE, plaintiff could perform jobs

which exist in significant numbers in the national economy. (T. 25-26).

## V.   ISSUES IN CONTENTION

Plaintiff raises the following arguments in support of her position that the ALJ's

decision is not supported by substantial evidence:

1. The ALJ's mental RFC determination is not supported by any medical opinion. (Pl.'s Br. at 6-7) (Dkt. No. 11).

2. The ALJ arbitrarily substituted her opinion for undisputed medical opinion without meeting the overwhelmingly compelling standard. (Pl.'s Br. at 7-9).

3. The ALJ improperly assessed the medical opinions and the medical evidence, including Dr. Amanda Slowik's consultative opinion. (Pl.'s Br. at 9-18).

Defendant argues that the Commissioner's decision is supported by substantial

evidence. (Def.'s Br. at 11-25) (Dkt. No. 14).  Plaintiff filed a reply brief in further

support of her arguments. (Dkt. No. 15-1).  For the following reasons, this court agrees

with the defendant and will affirm the Commissioner's final decision.

## VI.   RFC/Weight of the Evidence

### A.   Legal Standards

#### 1.   RFC

RFC is "what [the] individual can still do despite his or her limitations.

Ordinarily, RFC is the individual's maximum remaining ability to do sustained work

activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular

and continuing basis" means eight hours a day, for five days a week, or an equivalent

work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2

(N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999)

(quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence.  *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

## 2.    Weight of the Evidence

In making a disability determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996).  Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings."  The responsibility for determining these issues belongs to the Commissioner.  *See* SSR 96-5p, 1996 WL 374183, at *2.  These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d).  The ALJ must clearly state the legal rules that he applies and the weight that she accords the evidence considered.  *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

The regulations regarding the evaluation of medical evidence were amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded.  According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion."  Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a),

416.920c(a).  Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors."  20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

### B.    Analysis

Plaintiff first argues that the ALJ's RFC was not supported by any medical opinion. (Pl.'s Br. at 6).  Plaintiff states that the "ALJ concludes that Plaintiff does not have any limitations to work pace or attendance," without any medical basis for such finding. (*Id.*)  However, the ALJ's RFC specifically incorporated a work-pace limitation when the ALJ determined that plaintiff could perform simple, routine tasks, with "***no production rate pace and no more than occasional changes in the work routine***." (T. 21, 23) (emphasis added).  In addition, the ALJ's RFC evaluation is supported by Dr. Slowik's consultative report, Dr. Harding's report,[9] and the record as a whole.

The ALJ's consideration of Dr. Slowik's consultative report was detailed. (T. 22-24).  Dr. Slowik concluded that due to distractibility, cognitive deficits, anxiety, and a low mood, plaintiff had no limitations in using reason and judgment in making work related decisions and mild limitations in understanding and applying simple instructions.  She had moderate limitations in understanding and applying complex instructions, interacting with others, and regulating emotions; mild to moderate limitations in sustaining concentration; and moderate to marked limitations in

---

[9] Dr. Harding was a non-examining State Agency psychologist. (T. 78).

sustaining an ordinary routine. (T. 276).

Most of these limitations are accounted for in the ALJ's RFC determination, which included limits on pace, contact with others, and changes in the work routine. The ALJ explained why she was not adopting more restrictive limitations. The ALJ first stated that "in contrast with [Dr. Slowik's] suggestion that claimant had moderate or marked[10] limitations in multiple areas of mental functioning, the consultant concluded that the claimant's psychological and cognitive problems did not appear significant enough to interfere with her daily functioning."[11] (*Id.*)  The ALJ noted this inconsistency but determined that most of Dr. Slowik's other findings regarding plaintiff's ability to perform tasks had support in the record.

The ALJ found that Dr. Slowik's opinion, to the extent adopted by the ALJ, was supported by plaintiff's "wide range of daily activities."[12] (T. 24).  These activities included driving, shopping, caring for pets, paying bills, and doing household chores. (*Id.*)  However, Dr. Slowik's opinion that plaintiff had up to "marked" limitations in sustaining an ordinary routine was inconsistent with plaintiff's ability to manage her household. (*Id.*)  The ALJ is entitled to consider a plaintiff's daily activities in

---

[10] Dr. Slowik found that plaintiff would have a "moderate to marked" limitation only in the area of sustaining an ordinary routine. (T. 276).  The rest of the limitations were listed as either mild, mild to moderate, or moderate. (*Id.*)

[11] Dr. Harding's findings very closely mirrored Dr. Slowik's findings. (T. 76).

[12] Contrary to plaintiff's claim that the ALJ discounted Dr. Slowik's opinion as being "too vague to be useful," (Pl.'s Br. at 13), the ALJ stated that Dr. Slowik's terms were "vague and open to interpretation."  Tthe ALJ then relied on a many of the limitations assessed by Dr. Slowik and explained why she did not adopt greater limitations. (T. 24).  It is clear that the ALJ used much of Dr. Slowik's opinion in formulating the RFC.

conjunction with the medical evidence of record. *See Medina v. Comm'r of Soc. Sec.*, 831 F. App'x 35, 36 (2d Cir. 2020) (allowing ALJ to consider daily activities in determining consistency with alleged symptoms); *Roland M. v. Saul*, No. 8:19-CV-1624 (MAD), 2020 WL 7356716, at *4-5 (N.D.N.Y. Dec. 15, 2020).  The ALJ is entitled to formulate an RFC that is based upon the record as a whole, even if the RFC does not reflect any one opinion in its entirety as long as the ALJ explains why portions of any particular report were not as persuasive. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (noting that an ALJ's RFC does not need to "perfectly correspond with any of the opinions contained in the record"); *Younes v. Colvin*, No. 1:14-CV-170 (DNH/ESH), 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015) (there is no "absolute bar to crediting only portions of medical source opinions.")

In this case, plaintiff did more than manage her own household.  She cared for her mother until she passed away in 2017 (T. 37), and at the time of the ALJ's hearing, plaintiff was helping her disabled brother, who lived in the apartment below her.  In addition to taking care of her personal hygiene, plaintiff drove (T. 36), did yard work, did housework for herself and her brother,[13] paid bills, went grocery shopping, helped her brother cook meals, and took care of two cats. (T. 187-91).  In her Function Report, dated April 9, 2018, plaintiff stated that she took breaks due to her back pain and because she did not sleep well, but stated that she performs a variety of functions because "there is no one else to do it." (T. 189-90).  As stated by the ALJ, these activities are inconsistent with a "marked" limitation in sustaining an "ordinary

---

[13] In her "Function Report," plaintiff stated that she cleaned her apartment and her brother's apartment. (T. 188).

routine." In addition, by her own admission, the "breaks" that plaintiff took during these activities were due to physical impairments, which are not at issue in this case, or to fatigue, but not due to her mental limitations.

Plaintiff takes issue with the ALJ drawing a "negative inference" from plaintiff's ability to attend her medical appointments regularly. (Pl.'s Reply Br. at 3). Plaintiff argues that this places her in a "heads I win, tails you lose" situation, and that the ability to attend medical appointments does not equate to the ability to perform full-time work. (*Id.*) The fact is that, other than missing one appointment due to illness, which she specifically cancelled, the plaintiff attended all her counseling appointments. However, the ALJ did not rely solely on this fact or "equate" this with the ability to perform full time work. The ALJ noted this fact when making the determination that the limitation on plaintiff's ability to maintain a routine was not "marked." The ability to sustain a routine, to leave the house and attend regular appointments is relevant to plaintiff's functional ability, even if in itself, this ability does not mean that plaintiff can perform full-time work. *Medina v. Comm'r of Soc. Sec.*, 831 F. App'x at 36 (ALJ properly considered that plaintiff engaged in many activities requiring concentration and the ability to stay on task, including driving, cleaning, doing laundry, cooking, and shopping, noting that these activities required "many of the same functions that the claimant alleges she is unable to perform in a work setting.")

The ALJ did consider all of plaintiff's activities. As stated above, the ALJ also relied on plaintiff's ability to manage her and her brother's households. (T. 24, 187-94). While the ALJ's decision did not list every activity, she cited plaintiff's Function

Report, in which the plaintiff lists multiple activities which she performs on a routine basis, supporting the ALJ's determination that her limitations in this area were not "marked." (T. 187-94).  Plaintiff argues that the Function Report indicates that the plaintiff takes frequent breaks.  While plaintiff is correct, most of the breaks to which the plaintiff refers are due to her alleged physical issues, which are not relevant to her claims in this case. (*See e.g.* T. 189) ("I have to take frequent breaks because of my back pain when I am doing physical activities and I have to sit down for a while because of my migraines and *sometimes* I feel weak/dizzy because of lack of sleep."[14] (emphasis added); she prepares salads and microwave dinners so that she does not have to stand for long; frequent breaks doing laundry, cleaning, and mowing).  Thus, the ALJ did not err in relying on plaintiff's ability to attend her medical appointments in addition to all of her other daily activities in determining that there were no "marked" limitations to maintaining a routine.

Work pace and attendance fall under the category of concentration and persistence.[15] *Tyler M. v. Saul*, No. 3:19-CV-426 (CFH), 2020 WL 5258344, at *11–12 (N.D.N.Y. Sept. 3, 2020) (quoting *Lowry v. Comm'r of Soc*. Sec., No. 1:15-CV-1553 (GTS/WBC), 2017 WL 1290685, at *4 (N.D.N.Y. Mar. 16, 2017), *report and*

---

[14] The ALJ considered plaintiff's claims of fatigue when formulating plaintiff's RFC. (See T. 23).  The ALJ stated that "[t]he claimant's statements that her insomnia would prevent her from performing even simple tasks in a work environment are inconsistent with her engagement in many work-like tasks at home including personal care, household chores, mowing the lawn, driving a vehicle, preparing meals, and going shopping." (*Id.*).

[15] *See* 20 C.F.R. Pt. 404, Subpt. P, Listing 12.00(E)(3) & T. 82 (The "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances" is a subsection of "the individual's sustained concentration and persistence limitations.")

*recommendation adopted*, No. 1:15-CV-1553 (GTS/WBC), 2017 WL 1291760

(N.D.N.Y. Apr. 6, 2017).  This means the "'ability to sustain focused attention and

concentration sufficiently long to permit the timely and appropriate completion of tasks

commonly found in work settings.'" *Id.* (quoting *Cox v. Astrue*, 993 F. Supp. 2d 169,

182 (N.D.N.Y. 2012)).  Even a "moderate" limitation in the area of concentration,

persistence, or pace does necessarily preclude the ability to perform unskilled work. *Id.*

(citing *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010); *Matta*, 508 F. App'x. at 55

("The ALJ found that plaintiff had moderate difficulties in concentration, persistence

and pace . . . that limit [him] to simple, routine, low-stress, and unskilled tasks, which

involve no more than minimal contact with co-workers, supervisors and the general

public.") (internal quotation omitted)).

Dr. Slowik assessed only mild to moderate limitations in attention and

concentration, with intact memory.[16] (T. 275-76).  Thus, the ALJ's RFC restricting

plaintiff to unskilled work with no production rate pace and no more than occasional

changes in the work routine took into consideration the plaintiff's "work pace" and any

limitations in her ability to follow a routine.

Although Dr. Forbes, the plaintiff's treating primary care physician, submitted a

"check box" form indicating that plaintiff would be "off-task" for more than 33% of the

day, Dr. Forbes's treatment notes never actually assess the plaintiff's attention or

---

[16] The court notes that Dr. Slowik's mental examination showed only "mild" limitations in attention and concentration "due to claimant's limited intellectual functioning." (T. 275).  However, Dr. Slowik's medical source statement assessed plaintiff's limitation on the "ability to sustain concentration" as "mild[] to moderate[]." (T. 276).

concentration.  On two occasions, plaintiff completed a questionnaire[17] in which she stated that she had trouble "concentrating on things" "nearly every day." (T. 319, 325). However, Dr. Forbes's examinations consistently showed that plaintiff was awake and alert, and he never *observed* lack of concentration. (T. 306, 308, 310, 314, 318, 324, 328).  Plaintiff's counselor, Benita B. Donovan, LCSW-R, saw plaintiff from December of 2017 until plaintiff stopped attending counseling sessions in December of 2018. LCSW Donovan's December 18, 2017 mental status examination showed depression, anger, insomnia, fatigue, and social isolation, but also found that plaintiff was oriented, alert, cooperative, and had no memory impairment. (T. 260).  Plaintiff attended her counseling sessions regularly until she asked for a voluntary discharge.

In January of 2018, LCSW Donovan's mental status evaluation was similar to Dr. Slowik's, but LCSW Donovan also discussed plaintiff's skills, which included making jewelry. (T. 262).  On January 9, 2018, plaintiff reported lower fatigue and seemed "lighter in spirit." (T. 263).  Plaintiff showed LCSW Donovan a new bracelet that she had made with her beads. (*Id.*)  Plaintiff also reported a lower level of anxiety. (*Id.*) While plaintiff continued to exhibit symptoms of depression, fatigue, and anxiety, LCSW Donovan's mental status examinations continued to show that plaintiff was alert, oriented, her speech was normal, she was cooperative, and her memory was intact. (T. 265).

On February 13, 2018, plaintiff told LCSW Donovan that she had an "okay" week and had been more assertive with her brother because she was frustrated at his

---

[17] Plaintiff was completing a PHQ-9 questionnaire which is entitled "Depression Screening." (T. 319, 325).

lack of assistance with chores around the house. (T. 267).  The treatment notes indicate that plaintiff had to contact utility companies, which gave her increased anxiety, "but [s]he reported she faced the challenge well." (*Id.*)  She reported fewer panicky feelings, lower anxiety in general, and more hopeful feelings. (*Id.*)  On December 5, 2018, plaintiff was discharged from therapy because her "Treatment objective [was] achieved - by client self-report." (T. 338).  Plaintiff had a reduction of symptoms of panic, anxiety, and depression, with "somewhat better sleeping patterns." (*Id.*)  Plaintiff reported "more often engaging in enjoyable activities such as, creating colorful jewelry." (*Id.*)  She was better able to "take direct steps to confront her anxiety and follow sound decision making." (*Id.*)

A few weeks later, plaintiff told Dr. Forbes that she stopped going to therapy because she did not feel that it was helping. (T. 305).  However, she also told Dr. Forbes that that she had anxiety attacks "every now and then," and did not have panic attacks as often. (*Id.*) The ALJ's RFC evaluation is consistent with the portions of Dr. Slowik's report that she found more persuasive, and the ALJ's RFC took into account the limitations on concentration, the ability to follow a routine, and her problems interacting with others. The ALJ's explanation of why she did not adopt any greater limitations and why she did not include a specific reference to "pace" and "attendance" in the RFC is supported by substantial evidence.[18]

---

[18] In fact, in her RFC assessment, the ALJ specifically associates plaintiff's limitations to the ALJ's reasoning for choosing the various limitations in the RFC. (T. 23).  The ALJ associated plaintiff's insomnia with her prohibition on ladders, scaffolds, and other hazardous working conditions; she associated plaintiff's mild limitations on attention and concentration, notwithstanding her wide range of activities, with the limitation to simple, routine tasks; she associated plaintiff's stress with the limitation to work with no production rate pace and no more than occasional changes in the work

Plaintiff cites *Riccobono v. Saul*, 796 F. App'x 49, 50 (2d Cir. 2020) for the proposition that the ALJ must base her conclusion on some medical opinion or cite "overwhelmingly compelling" evidence for her failure to do so. (Pl.'s Reply Br. at 3). In *Riccobono*, the Second Circuit specifically stated that the ALJ could not interpret "raw medical data" to discount the doctors' opinions. *Id.*  That does not mean that an ALJ is precluded from weighing two or more medical "opinions" and formulating an RFC which does not specifically adhere to one opinion. *Matta, supra*.  In this case, the ALJ weighed the opinions of Dr. Slowik, Dr. Harding, and Dr. Forbes to formulate plaintiff's RFC.  In doing so, the ALJ discounted the extent of the limitations suggested by Dr. Forbes and the extent of some of the limitations stated by doctors Slowik and Harding based upon the medical and other evidence of record, including the plaintiff's daily activities, progress notes, and counseling notes, written by LCSW Donovan. *See Jack B. v. Comm'r of Soc. Sec.*, No. 19-CV-1202 (FPG), 2021 WL 780303, at *5 (W.D.N.Y. Mar. 1, 2021) (distinguishing *Riccobono* and finding that the ALJ correctly weighed the medical opinions even though the ultimate RFC did not "perfectly correspond" with any of the opinions).  Thus, the ALJ did not need to cite to "overwhelmingly compelling" evidence because she based her RFC on a proper analysis of the medical opinions and the record evidence.

With respect to "attendance," Dr. Harding's report indicated that plaintiff would

---

routine; and that notwithstanding her generally adequate social skills and cooperative attitude, she associated plaintiff's social limitation with a limitation to frequent interaction with co-workers, but only occasional interaction with the public. (*Id.*)  The ALJ then stated "[m]oreover, her allegations regarding the extent of her problems with memory, concentration and attention and even her sleeping problems, are not adequately corroborated in the medical records, which show only mild cognitive deficits, if any. (*Id.*)  The ALJ then discussed the weight of the medical evidence. (T. 23-25).

be "moderately" limited in her ability to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances." (T. 82). Even a moderate limitation in maintaining a regular schedule does not preclude substantial gainful activity. *See Andrea N. v. Saul*, No. 3:18-CV-1186 (CFH), 2020 WL 1140512, at *6 (N.D.N.Y. Mar. 9, 2020) ("because the record evidence establishes that plaintiff has, at most, a moderate limitation in maintaining a regular work schedule and work-pace and the RFC specifically limits plaintiff to light work that involves only simple, routine tasks with minimal contact with coworkers, supervisors, or the public, the RFC adequately 'accounts for [the plaintiff's] limitations for performing activities within a schedule and maintaining regular attendance.'") A "plaintiff may disagree with the ALJ's conclusion; however, the Court must 'defer to the Commissioner's resolution of conflicting evidence' and reject the ALJ's findings 'only if a reasonable factfinder would have to conclude otherwise.'" *Morris v. Berryhill*, 721 F. App'x 29 (2d Cir. 2018) (internal citations and quotations omitted)).

The court does note that the ALJ's opinion contains what could be interpreted as confusing statements regarding the terms used by the medical personnel, and defendant conceded that the ALJ could have erred in one of her statements in this regard. (Def.'s Br. at 18). Plaintiff argues that the ALJ erred in stating that Dr. Slowik's opinion was "vague" due to Dr. Slowik's use of the terms "mild," "moderate," and "marked" to describe the plaintiff's limitations because "[t]hose terms are not defined in the Social Security Act or regulations with regard to an individual's mental residual functional capacity, and they are therefore vague and open to interpretation, limiting their utility in

21

determining the claimant's specific capabilities or limitations." (T. 24).  The ALJ also stated that Dr. Slowik "further compound[ed] the vagueness of her opinion of the claimant's mental abilities" by "using ranges of functioning." (T. 24).

The terms, mild, moderate, and marked are defined in the regulations with respect to listed impairments and with respect to the psychiatric technique used to evaluate severity for a listing. See 20 C.F.R. Part 404, Subpt P, App'x 1, § 12.05(F)(2) (referring to the "five-point rating scale," beginning with "no limitations" and ending with "extreme limitation." *Id.* As the ALJs' decisions generally state in their description of the regulations: "[t]he limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process." (T. 20).  The mental RFC assessment at steps 4 and 5 of the sequential evaluation process requires "a more detailed assessment of the areas of mental functioning." (T. 20-21).  An RFC assessment "reflects the degree of limitation" that the ALJ found in the Listing analysis, but contains a more detailed functional analysis. (T. 21).

In this case, it appears that the ALJ was attempting to explain that the terms "mild, moderate, marked, and extreme" are expressions of plaintiff's mental limitations. In and of themselves, these terms do not constitute an RFC evaluation.  Rather, the RFC evaluation must express more specific limitations and/or abilities.  The ALJ determines the RFC based upon these limitations, in conjunction with the medical and other evidence of record to determine plaintiff's specific limitations.  Thus, the ALJ's statement regarding these limitations, while confusing, is technically correct.

The ALJ's statement that the term "unskilled" is "vague" was in error.[19]  The ALJ stated that Dr. Harding used the terms "unskilled" and "low contact" which were "as vague as those Dr. Slowik used, and as such, Dr. Harding's opinion did not provide any specificity with regard to the claimant's mental functioning beyond a general impression that she had some cognitive and social limitations.[20] (T. 24).  Thus, the ALJ found Dr. Harding's opinion only "somewhat persuasive," and the ALJ stated that she "assigned specific mental limitations in a manner commensurate with the complete evidence available at the hearing level." (T. 24).

To the extent that the ALJ's statement was error, any such error was harmless. Rather than using the term "unskilled," the ALJ found that plaintiff could perform simple, routine tasks in an environment with no production rate pace and no more that occasional changes in the work routine. (T. 21).  Unskilled work is defined in the regulations as "'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.'" *Lee W. v. Comm'r of Soc. Sec.*, No. 1:20-CV-008 (DB), 2021 WL 1600294, at *6 (W.D.N.Y. Apr. 23, 2021) (quoting 20 C.F.R. 416.968(a)).  The regulations state that "'the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people).'" *Id.* (quoting 20 CFR Pt. 404, Subpt. P. App. 2 § 202.00(g)).  Thus, "unskilled work, by definition, already accounts for some limitations in mental functioning, including limitations interacting with others and learning new tasks." *Id.*  A limitation to simple

---

[19] Defendant concedes that this statement is error. (Def.'s Br. at 16).

[20] Dr. Harding did not examine the plaintiff and appears to have relied heavily on Dr. Slowik's assessment.

routine tasks, is consistent with the demands of unskilled work.[21] *See* SSR 85-15, 1985 WL 56857 at *4 (Unskilled work requires "the abilities . . . to understand, carry out, and remember simple instructions[.]") The jobs mentioned by the VE all had a Specific Vocational Preparation ("SVP") of 2,[22] which is the equivalent of "unskilled" work. *See Day v. Astrue*, No. Civ. 09-131 (DRH), 2011 WL 1467652, at *7, n.5 (E.D.N.Y. Apr. 18, 2011) (citing Dictionary of Occupational Titles ("DOT"), 4th ed. revised 1991 (Appendix C); 20 C.F.R. § 404.1568; and Social Security Ruling ("SSR") 00–4p ). Thus, regardless of any error the ALJ might have made by stating that "unskilled" was "vague," the RFC was appropriate to unskilled work, and all of the jobs mentioned by the ALJ were unskilled.  Any error was, therefore, harmless.

Plaintiff also argues that the error is not harmless because nothing equates "low contact" in Dr. Harding's report with the ALJ's finding that plaintiff can have "frequent" contact with co-workers and supervisors and "occasional" contact with the public.  First, the ALJ did not "equate" low contact with her ultimate RFC determination.  The ALJ stated that the term "low contact" was vague. (T. 24). The ALJ then stated that Dr. Harding's opinion did not provide specificity with regard to plaintiff's mental functioning, and the ALJ found the opinion to be "somewhat persuasive."  The ALJ stated that she was assigning the "specific mental limitations in a manner commensurate with the complete evidence available at the hearing level." (*Id.*)

The ALJ explained her reasoning for her finding regarding plaintiff's ability to

---

[21] The ALJ may have been attempting to state that she was articulating more specific limitations and abilities in her RFC than a simple reference to "unskilled" work.

[22] (T. 54).

have contact with others. (T. 19, 23, 24).  She discussed plaintiff's ability to interact with others when she found at step three, based on Dr. Slowik's evaluation, that plaintiff had a moderate limitation in her ability to interact with others. (T. 19).  The ALJ then found that plaintiff's activities, as well as notations in her medical records, did not show more than mild to moderate anxiety, nor were there consistent reports of her inability to interact with others.  Plaintiff was generally cooperative, had a full affect, and adequate social skills, and there was a "lack of objective evidence" showing anger, irritability, aggression, or any other behavioral issues. (T. 19).

Later in the ALJ's analysis at step 4, she noted that the medical evidence showed plaintiff to have generally intact social skills and a cooperative attitude. (T. 23) (citing T. 273-77 (Dr. Slowik); T. 285-331 (Lourdes Center for Family Health); and T. 338-44 (Counseling Records LCSW Donovan)).  However, based on plaintiff's own statements that she preferred to be alone, her past problems getting along with others, and her difficulty with strangers and crowds,[23] the ALJ found that plaintiff could only have "frequent" interaction with her co-workers and supervisors, and only "occasional" interaction with the public. (T. 24).

The ALJ further supported her finding with references to the medical opinions. (T. 24). The ALJ cited Dr. Slowik's examination, in which she found that plaintiff's social skills, including her ability to regulate emotions were "moderately" limited. (T. 24, 276).  In a very similar case, the court upheld the ALJ's RFC determination when

---

[23] The ALJ noted that plaintiff stated that she had more difficulty with crowds and strangers. Therefore, the ALJ placed more restriction on plaintiff's contact with the public. (T. 23).  Thus, the ALJ based some of her restrictions on plaintiff's own statements about her condition, which were consistent with some of her statements to her medical providers.

plaintiff was "moderately" limited in her social skills, had anxiety and panic symptoms, particularly when she was in a crowd, but one of her doctors found that her manner of relating and interpersonal skills were adequate. *Jodi B. v. Comm'r of Soc. Sec.*, No. 19-CV-834, 2021 WL 3682736, at *5 (W.D.N.Y. Aug. 19, 2021).  In *Jodi B.*, the ALJ found that with her moderate social limitation, the plaintiff could have frequent contact with co-workers and occasional contact with the public. *Id.*  A "moderate" limitation is defined as a "fair" ability to function independently, appropriately, effectively, and on a sustained basis in that area. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F)(2)(c).

In *Jodi B.*, the plaintiff also challenged the ALJ's failure to include a reference to supervisors, but the court held that any such error was harmless because it could "glean" the ALJ's rationale from the decision. 2021 WL 3682736, at *5.  In this case, the ALJ included a reference to plaintiff's supervisors, finding that plaintiff's moderate social limitations did not prevent her from frequent contact with both co-workers and supervisors, while limiting her contact with the public to "occasional."  The ALJ found that although plaintiff claimed to have difficulties in large groups and with strangers, there was a lack of additional behavioral abnormalities justifying a greater limitation.[24] While plaintiff focuses on the error that the ALJ may have made with respect to Dr. Harding's opinion, the bottom line is that the ALJ did not rely on Dr. Harding's opinion, finding it only somewhat persuasive, and instead relied on the other evidence in the record, including Dr. Slowik's opinion to determine plaintiff's specific

---

[24] While plaintiff testified to rage and anger, and stated that she would scream and swear, she then stated that she tried not to throw things because she did not like the idea of breaking things in her house. (T. 45).  This statement is inconsistent with an inability to control her anger.

limitations.  Thus, the ALJ's basis for finding that plaintiff could have frequent contact with co-workers and supervisors, while only occasional contact with the public was supported by substantial evidence.

Defendant argues that to the extent that equating "low contact" with "frequent contact" was in error, it was harmless because two of the jobs cited by the ALJ were rated "People 8," in which interaction with people is not a significant aspect of the job. (Def.'s Br. at 17).  The Dictionary of Occupational Titles ("DOT") "provides a code, numbered 0-8, for the type of social interaction each occupation requires." *Jodi B.*, 2021 WL 3682736, at *5 (quoting *Habschied v. Berryhill*, No. 17-CV-6217(P), 2019 WL 1366040, at *9 (W.D.N.Y. March 26, 2019) (citation omitted)).

The positions of mail clerk[25] and cleaner/polisher[26] each list the type of social interaction required as 8, which is described as attending to the work assignment instructions or orders of supervisor with no immediate response required unless clarification of instructions or orders is needed. *See* DOT, Appendix B, 1991 WL 688701 (1991).  A position with a social interaction level of 8 indicates that the degree of relation to people required for that position is not significant. *Id.*  Thus, even if the ALJ erred in failing to accept Dr. Harding's restriction to "low contact" or improperly interpreted low contact as allowing "frequent" interaction, the jobs that the ALJ ultimately proposed did not require significant contact with either co-workers or the

---

[25] Mail Clerk, DOT No. 209.687-026, 1991 WL 671813.

[26] Cleaner/Polisher, DOT No. 709.687-010, 1991 WL 679134.

public.[27]

The ALJ in this case weighed the record evidence in making her RFC determination.  That is the province of the ALJ, and her findings are supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the decision of the Commissioner is **AFFIRMED**, and this case be **DISMISSED**, and it is

**ORDERED**, that the Clerk enter judgment for **DEFENDANT**.

Dated: August 31, 2021

Andrew T. Baxter
U.S. Magistrate Judge

---

[27] In plaintiff's reply brief, counsel focuses on the ALJ's error in interpreting Dr. Harding's non-examining opinion and argues that the ALJ used "improper reasoning" to discount the "other" moderate limitations in Dr. Harding's opinion. (Pl.'s Reply Br. at 3).  However, Dr. Harding's opinion closely followed Dr. Slowik's findings, and the ALJ considered all the limitations stated by both doctors, describing why she did not adopt them to the extent that they assessed greater limitations in some areas.  Moreover, as stated above, moderate limitations are consistent with the ALJ's RFC determination.